IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NAJDL, | ) | Case No. 1:24-CV-00177 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, John Najdl, ("Najdl") seeks judicial review of the final decision of the

Commissioner of Social Security, denying his application for disability insurance benefits

("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

applied proper legal standards and reached a decision supported by substantial evidence, I

recommend that the Commissioner's final decision denying Najdl's application for DIB be

affirmed.

## II.      Procedural History

Najdl filed for DIB on April 9, 2020, alleging a disability onset date of February 23,

2019. (Tr. 388). The claims were denied initially and on reconsideration. (Tr. 328-31, 334-37).

He then requested a hearing before an ALJ. (Tr. 338-39). Najdl (represented by counsel) and a

vocational expert ("VE") testified before the ALJ who issued an unfavorable written decision on

January 19, 2021. (Tr. 1149-63). The Appeals Council denied his request for review, and he appealed the 2021 decision to this Court. (Tr. 1168-71, 1175-76). This Court reversed the Commissioner's decision and remanded Najdl's case for further administrative proceedings. (Tr. 1181-1204). After this Court's reversal, the Appeals Council vacated the ALJ's 2021 decision and remanded the case. (Tr. 1207).

Najdl testified at a hearing before the ALJ on April 26, 2023. (Tr. 1117-45). On May 31, 2023, the ALJ issued a written decision finding Najdl not disabled. (Tr. 1085-1110). The Appeals Council denied his request for review on August 24, 2023, making the hearing decision the final decision of the Commissioner. (Tr. 1075-78; see 20 C.F.R. §§ 404.955, 404.981). Najdl timely filed this action on January 29, 2024. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Najdl was 45 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 1109). He graduated from high school. (*See id.*). In the past, he worked as a store laborer, material handler, grocery stock clerk, and grocery bagger. (*Id.*).

### B.    Relevant Medical Evidence[1]

During the period at issue, Najdl was a veteran, 100% service connected for schizoaffective disorder; he treated for his mental health conditions at the Veteran's Administration ("VA"). (*See, e.g.*, Tr. 517). He had been hospitalized in 1996-97 for psychosis, including paranoid, disorganized thoughts, and recklessness. (Tr. 779). He lives alone, but his

---

[1] The relevant period is from February 23, 2019, Najdl's alleged onset of disability, through September 30, 2020, his date last insured. (*See* Tr. 18). I therefore focus my review of the medical evidence to that available between these dates.

mother assists him with his activities of daily living, such as grocery shopping or cleaning his house. (*See* Tr. 781).

On April 8, 2019, Najdl received individual therapy with Mary Zoller, LISW-SUPV. (Tr. 509-11). He felt he had disorganized thoughts and wished to improve his ability to stay focused and goal-directed in his speech and actions, but had made minimal progress to these goals. (Tr. 509). Ms. Zoller noted that Najdl was medication compliant, and was feeling good, sleeping well, and had more energy. (Tr. 510). On examination, he was alert and attentive, cooperative, with appropriate mood and affect, coherent thought processes, intact memory, and no unusual thought content. (*Id.*). He was recommended to follow up in six or seven weeks. (*Id.*).

On April 11, 2019, Najdl met with Anna-Lynn Tamayo-Reyes, M.D. for medication management. (Tr. 502-06). He reported his mood was "really good" and he was active in his church and had many activities there for the Lenten season. (Tr. 502). He was going out in the community, promoting the church, and inviting people to join in its activities for Easter. (*Id.*). He reported good sleep and fair appetite, was compliant with his medications and denied side effects; he had no fixed paranoia and denied hallucinations. (*Id.*). On examination, he had a bright, euthymic affect, normal thought process and content, and intact cognition with fair insight and judgment. (Tr. 505). Dr. Tamayo-Reyes noted that Najdl appeared to be stable on his current regime. (*Id.*). Dr. Tamayo-Reyes continued him on aripiprazole 30 mg daily, trazodone 50 mg as needed; bupropion XL 450 mg daily, buspirone 10 mg twice daily, and recommended continuing individual psychotherapy. (Tr. 506).

Najdl again met with Dr. Tamayo-Reyes on June 17, 2019. (Tr. 488-93). On examination, he was cooperative, engaging, and had appropriate eye contact, with normal speech, thought process, and thought content. (Tr. 491-92). He was diagnosed with schizoaffective disorder,

which appeared to be stable on his current regimen; he was tolerating the aripiprazole. (Tr. 492). Dr. Tamayo-Reyes continued him on all medications and recommended continuing individual psychotherapy. (*Id.*). He was recommended to follow up in eight weeks. (*Id.*).

Najdl followed up with Dr. Tamayo-Reyes on October 21, 2019. (Tr 660-64). He reported that he was having some days where he was a bit depressed due to seasonal changes, but overall most days were "okay." (Tr. 660). Dr. Tamayo-Reyes encouraged him to use his light box. (*Id.*). He reported he had joined a dating site and was getting to know a woman in Columbus he had met through the site. (*Id.*). He was compliant with his medications and denied side effects. (*Id.*). On examination, he had euthymic mood and affect, normal thought process and content, with intact cognition and fair insight and judgment. (Tr. 663). Dr. Tamayo-Reyes continued Najdl on all medications and recommended follow up in eight weeks. (Tr. 664).

On February 24, 2020, Najdl followed up with Dr. Tamayo-Reyes. (Tr. 575-78). He remained active in church and had continued to date the woman he met through online dating. (Tr. 575). His sleep and appetite were fair. (*Id.*). He was compliant with his medications and denied side effects. (*Id.*). On examination, he had euthymic mood and affect, with normal thought process and content, intact cognition, and fair insight and judgment. (Tr. 577). Dr. Tamayo-Reyes noted he appeared to be stable on his current regimen and continued all medications. (Tr. 577-78).

On April 10, 2020, Najdl met with Ms. Zoller. (Tr. 785). He reported that he was adjusting to the pandemic quarantine restriction and was trying to stay connected through his church's streaming services. (*Id.*). He had volunteered to do a cleaning detail at his condo building. (*Id.*). He reported missing the group sessions and was looking forward to when he could return. (*Id.*). On examination, he was alert, cooperative, and attentive, with normal,

4

coherent thought processes, and had intact memory. (*Id.*). He was recommended to follow up in four weeks. (*Id.*).

On April 24, 2020, Najdl called Ms. Zoller for assistance after having an increase in anxiety and sleeplessness. (Tr. 783). He was recommended to report these changes to Dr. Tamayo-Reyes during his appointment the following week, and to reach out to his therapist before the next scheduled appointment if needed. (*Id.*).

On April 27, 2020, Najdl met with Dr. Tamayo-Reyes via telehealth due to pandemic restrictions. (Tr. 779-83). Najdl reported difficulties adapting to pandemic restrictions and related isolation, although he maintained contact with friends and family. (Tr. 779). He denied suicidal or homicidal ideation, paranoia, or hallucinations. (*Id.*). On examination, his affect was constricted and mood frustrated, his thought process and content was normal, and cognition intact, with fair insight and judgment. (Tr. 781). Dr. Tamayo-Reyes increased trazodone to 100 mg and maintained Najdl's other prescriptions, with a recommendation to create and follow a new routine to help adapt to the pandemic. (Tr. 779, 782).

On May 11, 2020, Najdl met with Ms. Zoller for individual therapy. (Tr. 629-30). Ms. Zoller noted moderate progress to his goals of staying focused and goal-directed. (Tr. 630). He reported disorganized thoughts, anxiety, and depression. (Tr. 629). He had attended church the day before, and was gone for 12 hours, although many activities were discontinued. (Tr. 630). He was visiting with people in the driveway and had cut back on his cleaning duties at the condo building. (*Id.*). On examination, he was alert and cooperative, with appropriate affect and normal thought process and content. (*Id.*). He was recommended to follow up in four weeks, but was encouraged to schedule every two weeks during quarantine. (*Id.*).

5

On May 14, 2020, Najdl began group therapy at the VA via telephone. (Tr. 619-29). The meetings were scheduled for Tuesdays, Wednesdays, and Thursdays of each week, from 9:15 a.m. to 10:30 a.m. (*See, e.g.*, Tr. 628). Najdl attended these group sessions regularly and was an active participant. (*See, e.g.*, Tr. 619-29). He attended on a drop-in basis through October 2020. (*See, e.g.* Tr. 1031).

On May 28, 2020, Najdl met with Dr. Tamayo-Reyes via telehealth. (Tr. 616-19). He reported having a better mood, and Dr. Tamayo-Reyes observed an appropriate affect. (Tr. 618). He had normal speech, thought process, and thought content, with intact cognition and fair insight and judgment. (*Id.*). Dr. Tamayo-Reyes noted he was improved from the last visit. (*Id.*). She continued all medications and recommended follow up in eight weeks. (Tr. 618-19).

On July 28, 2020, Najdl met with Dr. Tamayo-Reyes for medication management. (Tr. 963-66). He reported that his active participation in the peer support group and in church was helping him to cope where he otherwise would have been depressed. (Tr. 964). He reported his mood was "okay" and he had some fragmented sleep, but most nights were fair. (*Id.*). He was compliant with his medication. (*Id.*). On examination, he was cooperative with appropriate eye contact, appropriate affect, and normal thought process and content, with intact cognition and fair insight and judgment. (Tr. 965-66). Dr. Tamayo-Reyes noted his schizoaffective disorder was stable, continued his medications, and recommended follow-up in eight weeks. (Tr. 966).

On September 28, 2020, just prior to Najdl's date last insured, he met with Dr. Tamayo-Reyes via telehealth. (Tr. 1036-39). He reported that he was "okay" and was adjusting to the time of the year. He had a slight dip in mood and motivation to do chores. (Tr. 1037). He reported finding benefit from his light box and Dr. Tamayo-Reyes encouraged Najdl to use it. (*Id.*). He continued to be involved in his church and in groups at the VA; he was aiming to be an

advocate for peer support. (*Id.*). He was compliant with his medications and denied side effects;

he also denied suicidal and homicidal ideations, paranoia, or hallucinations. (*Id.*). On

examination, his mood was okay, with slight depression, appropriate affect within normal range,

his thought process and content was normal, with intact cognition and fair insight and judgment.

(Tr. 1039). Dr. Tamayo-Reyes advised Najdl to start using his light box for 20 to 30 minutes

every morning upon waking up; she continued all medications. (*Id.*).

###    C.    Medical Opinion Evidence

On June 29, 2020, state agency reviewer, David Dietz, Ph.D., reviewed Najdl's mental

health records at the initial level. (Tr. 308-12). Dr. Dietz noted that Najdl was not able to work

on a schedule and needs additional time with tasks, but he could pay attention for 30 minutes and

was usually able to follow instructions; he was able to get along with authority figures. (Tr. 309).

Dr. Dietz also noted Najdl needed help with housekeeping motivation and preparing meals, but

he could clean, do laundry, prepare meals, and do household repairs with his mother's help. (*Id.*).

He could manage his money, drive, go out alone, and shop for groceries and supplies. (*Id.*). Dr.

Dietz provided the following opinion with respect to Listing 12.03(B): mild limitation in

understanding, remembering, or applying information; moderate limitations in interacting with

others, concentrating, persisting, and maintaining pace, and adapting or managing oneself. (Tr.

310). Dr. Dietz opined that the evidence did not establish the presence of "C" criteria. (*Id.*).  Dr.

Dietz adopted the previous ALJ's RFC dated February 27, 2019, including the following

nonexertional limitations:

> The claimant should avoid concentrated exposure to extreme heat and humidity.
> The claimant is further limited to routine tasks with no strict time demands or strict
> production quotas, and is limited to routine and predictable changes in the work
> setting. He is limited to occasional and superficial interaction with the public,
> coworkers, and supervisors, no fast pace production quotas. Superficial means the

job cannot require arbitration, negotiation or conflict resolution, management or supervision.

(Tr. 312).

At the reconsideration level, Irma Johnston, Psy.D., affirmed Dr. Dietz's findings on July 28, 2020. (Tr. 317-319).

### D. Administrative Hearing Evidence

On April 26, 2023, Najdl testified at a post-remand hearing before the ALJ. (Tr. 1120). He testified that, between February 2019 and September 2020, he was frequently attending therapy sessions via video. (Tr. 1125). His routine was to attend these sessions two or three times a day, three to four days per week. (*Id.*). He also saw his psychiatrist every two weeks via video session during the pandemic. (*Id.*). He was being treated for depression, anxiety, lack of focus, and isolation from the pandemic. (Tr. 1125-26). He has a difficult time interacting with people he does not know, even if by video. (Tr. 1126). He stated it was difficult for him to interact with others at work, including supervisors, and described having difficulty communicating when he did not understand work instructions. (*Id.*). He took his medications as prescribed. (Tr. 1128). However, the medications only curb his symptoms but do not completely help his mental health conditions. (*Id.*). He also experiences side effects from the medications, including frequent urination, dry mouth, increased appetite, and jitteriness. (*Id.*). Najdl also complained of interrupted sleep, including nightmares. (Tr. 1129-30).

Najdl attended church two to three days per week, on Sundays and Wednesdays, and sometimes on Saturdays. (Tr. 1128-29). He was also on the team volunteering to clean the church once per month. (Tr. 1129). A typical day included waking up between 3:00 a.m. and 7:00 a.m. and starting his day with prayer and meditation. (Tr. 1129-30). He would then have a couple of video sessions with the VA between 10:00 a.m. and 2:00 p.m., followed by support

groups on video chat. (Tr. 1130). His mother would come over to help him with lunch or dinner and completing chores such as cleaning or laundry. (*Id.*). He watched sports in the evenings. (*Id.*).

The VE then testified. The ALJ presented the following hypothetical: an individual who has the ability to engage in a full range of work at all exertional levels, but with non-exertional limitations including avoiding concentrated exposure to heat and humidity, routine tasks with no strict time demands or strict production quotas; limited to routine and predictable changes in the work setting; occasional and superficial interaction with the public, coworkers, and supervisors, with superficial defined as meaning no arbitration, negotiation, or conflict resolution, management, or supervision of others, or being responsible for the health, safety, or welfare of others; and no fast-paced production quotas. (Tr. 1130-31). The VE testified that all past relevant work would be excluded under this hypothetical. (Tr. 1130). However, the VE identified other available jobs as Linen Room Attendant, 58,000 jobs in the national economy; Sweeper-Cleaner, 298[2] jobs in the national economy; and Industrial Cleaner, 195,000 jobs in the national economy. (Tr. 1140).

The ALJ then presented a second hypothetical: full range of work at all exertional levels; no environmental limitations; the individual can understand, remember, and apply information to complete simple instructions for short-cycle work tasks; have occasional changes in tasks; no strict hourly production quotas; can interact with the general public, coworkers, and supervisors for work-related tasks and purposes such as asking questions, gathering information, collecting data, pointing or directing where items may be placed; but no other work tasks that require

---

[2] In response, the VE states "the Sweeper-Cleaner . . . was 298." (Tr. 1140). However, in context, it appears that the VE intended to testify there were 298,000 jobs in the national economy. (*See id.*).

conflict resolution or directing the work of others. (Tr. 1140-41). The VE testified that such an individual could perform work as a Counter Supply Worker, DOT 319.687-010, SVP 2, medium exertional level, and 87,000 jobs in the national economy; Hospital Cleaner, DOT 323.687-010, SVP 2, medium exertional level, 244,000 jobs in the national economy; and Laundry Worker I, DOT 361.684-014, SVP 2, medium exertional level, and 26,000 jobs in the national economy. (Tr. 1141).

The ALJ then presented a third hypothetical: full range of work at all exertional levels, but with non-exertional limitations including that he can understand, remember, and apply information to complete simple instructions for short-cycle work tasks; have up to occasional changes in tasks; no strict hourly production quotas; can interact up to occasionally with the general public, and up to frequently with coworkers and supervisors for work-related tasks and purposes such as asking questions, gathering information, collecting data, pointing or directing where items may be placed, but no work tasks that require conflict resolution or directing the work of others. (Tr. 1141-42). The VE testified that the Counter Supply Worker, Laundry Worker I, and the Hospital Cleaner positions identified in the previous hypothetical would still be available. (Tr. 1142).

The VE also testified that an employer would not tolerate off-task behavior of 15% or more. (*Id.*). An employer would only tolerate one absence per month (including arriving late or leaving early); two or more times per month would lead to reprimand, up to and including termination. (Tr. 1142-43). The VE testified that training for the identified jobs would take up to 30 days to learn, and that a person would interact with a supervisor during this time of up to two hours per day. (Tr. 1143). An individual with a restriction to only occasional interaction with supervisors or coworkers would be competitive in such a position. (*Id.*).

10

IV.    **The ALJ's Decision**

In her decision dated May 31, 2023, the ALJ issued the following decision:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2020.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of February 23, 2019 through his date last insured of September 30, 2020 (20 CFR 404.1571 et seq.).

3.    Through the date last insured, the claimant had the following severe impairment: schizoaffective disorder (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand, remember, and apply information to complete simple instructions for work tasks that are short cycle, have up to occasional changes in tasks, and do not have strict hourly production quotas; and can interact up to occasionally with the general public, and up to frequently with co-workers and supervisors, for work related tasks and purposes, such as asking questions, gathering information, collecting data, and pointing or directing where items may be placed, but no work tasks that require conflict resolution or directing the work of others.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on January 19, 1975 and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). 10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there

were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

10.     The claimant was not under a disability, as defined in the Social Security Act, at any time from February 23, 2019, the alleged onset date, through September 30, 2020, the date last insured (20 CFR 404.1520(g)).

(Tr. 1083-1110).

## V.     Law & Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.     Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial

evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.,* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing

13

court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.    Discussion

Najdl brings two issues for this Court's review:

1.    Whether the Administrative Law Judge's decision that Plaintiff does not meet or equal Listing 12.03 is supported by substantial evidence; and

2.    Whether the ALJ's hypothetical question to the vocational expert is an accurate reflection of Plaintiff's functioning.

(ECF Doc. 12, p. 1).

### A.    The ALJ's decision that Najdl does not meet or equal Listing 12.03(C) is supported by substantial evidence.

Najdl first argues the ALJ's determination that he does not meet the Paragraph C criteria of Listing 12.03 for his schizoaffective disorder is not supported by substantial evidence. (*Id.* at pp. 8-11). He argues that the ALJ's analysis and reasoning to support her finding that he does not meet the 12.03(C) criteria is insufficient. (*Id.* at p. 9). In particular, he asserts that the ALJ's finding that he could "'adapt through the COVID-19 pandemic and the challenges it presented' and was able to act in his own interest to seek obtain and maintain services" was not relevant to the determination of whether he could adapt to the demands of a work setting. (*Id.*, quoting Tr. 1097). He argues that it is unclear how the ALJ reached her decision, despite a record of attending multiple group therapy sessions per week, and receiving assistance with chores from his mother. (ECF Doc. 12, p. 10). In short, Najdl appears to assert the ALJ cherry-picked evidence in the record while ignoring evidence supportive of disability. (*Id.* at pp. 10-11).

The Commissioner, by contrast, asserts the ALJ properly followed the regulations to find that Najdl did not meet the Paragraph C criteria of Listing 12.03. (ECF Doc. 14, pp. 11-20). The Commissioner had the support of state agency reviewing psychiatrist opinions to confirm that Najdl did not meet the Listing 12.03(C) criteria, and additional support from a medical expert would be duplicative and unnecessary. (*Id.* at pp. 14, 19-20, quoting *Norris v. Colvin*, No. 1:13 CV 1737, 2014 WL 3900865, at *15 (N.D. Ohio Aug. 11, 2014) *and* 20 C.F.R. § 404.1513a(b)(1)). Furthermore, the Commissioner provides excerpts from the ALJ's decision to demonstrate that she appropriately considered all of the evidence, including the evidence Najdl uses to support his assertion that he is disabled. (ECF Doc. 14, pp. 16-19). Therefore, Najdl has not demonstrated error and any assertion to the contrary amounts to a request for this Court to re-weigh the evidence. (*Id.* at pp. 11-20).

Listing 12.03 establishes the criteria for schizophrenia spectrum and other psychotic disorders. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.03. To meet or equal the severity of Listing 12.03, the claimant must show that he meets: (1) the impairment specific medical criteria in Paragraph A; and, (2) the functional limitations criteria in Paragraphs B or C. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A), 12.03. Najdl asserts only that he meets the Paragraph C criteria, and accordingly, I focus my analysis on this issue only. (*See* ECF Doc. 12, pp. 8-11).

To meet Paragraph A for schizophrenia spectrum disorders, the claimant must show medical documentation of:

A.  Medical documentation of one or more of the following:

1.  Delusions or hallucinations;

2.  Disorganized thinking (speech); or

3.  Grossly disorganized behavior or catatonia.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.03(A).

To meet the criteria for Paragraph C, a claimant must show:

[his] mental disorder in this listing category is "serious and persistent;" that is, [he has] a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.03(C).

Furthermore, at Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all criteria for a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *see also Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) *and Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). But the ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as

16

disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; see also *Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014), quoting *Sheeks*, 544 F. App'x at 641-42. "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.*, citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; see also *Forrest v. Comm'r of Soc. Sec*., 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Here, the ALJ found that the evidence in the record did not support a finding that Najdl met the Paragraph C criteria. (Tr. 1096-97). The ALJ reached this conclusion with the following discussion:

> The claimant's reported daily activities, examination findings, and persuasive portions of the medical opinions discussed above, show a level of functioning inconsistent with a minimal capacity to adapt to changes or to demands that are not already a part of the claimant's life. While the claimant has ongoing treatment, including multiple group sessions per week, the record does not reflect that he requires a highly supportive environment and is incapable of adjusting to changes in his environment. The claimant's reports suggest that he adapted through the COVID-19 pandemic and the challenges it presented. At worst, his judgment and insight were noted as fair, and he consistently was able act in his own best interest to seek, obtain, and maintain services. He did not live in a supportive environment. He had some assistance from family at times, and with various tasks, at times; however, he lived independently, was able to cook for himself, manage his finances, attend his appointments, and generally make decisions in his own best, self-interest. Moreover, the state agency psychological consultants did not find that

17

the record includes evidence to support the paragraph C criteria, in this case (C2A, C4A). Accordingly, the medical evidence of record fails to satisfy the necessary criteria of "paragraph C".

(*Id.* at 1097). I find that the ALJ's discussion is well-supported by substantial evidence. She discussed the evidence both supportive of and against a finding of disability. Notably, she also discusses the evidence Najdl now presents to support his assertion that he is disabled – that he "has ongoing treatment, including multiple group sessions per week" and that "[h]e had some assistance from family at times, and with various tasks, at times[.]" (*Id.*). Nonetheless, the ALJ concluded that the medical evidence of record failed to satisfy the paragraph C criteria, noting that agency reviewers did not find evidence supportive of paragraph C criteria, and that Najdl's reported daily activities, such as his ability to "live[] independently," "cook for himself, manage his finances, attend his appointments, and generally make decisions in his own best, self-interest" did not meet the criteria in paragraph C of Listing 12.03. (Tr. 1097).

Najdl does not meet his burden to demonstrate otherwise. Although he points to some facts supportive of a finding that he meets the criteria of 12.03(C), the ALJ discussed this evidence and found otherwise. The ALJ's decision is clear and reasoned and does not "cherry-pick" the evidence. I find no error and decline to recommend remand on this basis.

**B.     The ALJ's hypothetical question to the VE and her resulting RFC accurately reflects Najdl's functional limitations.**

Najdl titles his second issue as an error with the ALJ's hypothetical question to the VE. However, the arguments presented on this issue focus on whether the resulting RFC is accurate to his abilities, and I focus my analysis accordingly. (ECF Doc. 12, p. 11 ("In arriving at her residual functional capacity (RFC) finding, Plaintiff argues the ALJ erred in her RFC assessment in that she failed to incorporate Plaintiff's inability to sustain gainful employment.")). Najdl argues that he requires weekly group therapy sessions, and that the ALJ's failure to incorporate

18

these sessions into her assessment ignores the VE's testimony that a worker who is absent or late once per month is not able to work in competitive employment. (*Id.* at p. 12). Therefore, Najdl contends that the ALJ's RFC determination is not supported by substantial evidence, and she has failed to build an accurate and logical bridge between the evidence and her resulting RFC. (*Id.*).

The Commissioner asserts that, as an attack on the RFC (and not an attack on the hypothetical given to the VE), Najdl has not met his burden on Step Four issues, including the RFC. (ECF Doc. 14, p. 20, quoting *Rutherford v. O'Malley*, No. 6:23-CV-161-HAI, 2024 WL 2275238, at *8 (E.D. Ky. May 20, 2024)). He has not identified medical opinion support to demonstrate he requires multiple group therapy sessions per week. (ECF Doc. 14, pp 20-21). In the Commissioner's view, without more, Najdl's argument amounts to a request to reweigh the evidence in his favor. (*Id.* at p. 21).

Before proceeding to Step Four of the sequential analysis, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p. "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p.

"[T]he regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC 'based on all of the relevant medical and other evidence of record.'" *Harris v. Comm'r of Soc. Sec.,* No. 1:13-cv-00260, 2014 WL 346287,

at *11 (N.D. Ohio, Jan. 30, 2014). An ALJ must "provide a coherent explanation of [her] reasoning." *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021).

Even though Najdl presents this argument as a Step Five error, he nonetheless retains the ultimate burden of demonstrating he is disabled. *See Combs*, 459 F.3d at 642-43. However, "[c]iting selective portions of the record that support one's own conclusion does not meet this burden." *Hollinger v. Comm'r of Soc. Sec*., No. 1:23-CV-00418-BYP, 2024 WL 310715, at *9 (N.D. Ohio Jan. 11, 2024), *report and recommendation adopted*, No. 1:23-CV-418, 2024 WL 310092 (N.D. Ohio Jan. 26, 2024). Rather, where a plaintiff disagrees with the ALJ's analysis of his limitations, he must meet the burden of showing specifically how his impairment limits him to a degree inconsistent with the ALJ's RFC determination. *Id.*

Najdl specifically takes issue with the ALJ's statement regarding the group therapy sessions he attends multiple times per week at the VA:

> The claimant's representative argued disability . . . [in part] due to the 10 days per month of treatment the claimant required. The undersigned considered the arguments of the claimant's representative from the hearing and as set forth in Exhibits C13E and C19E; however, for the reasons explained in this decision, the representative's arguments are not persuasive. The claimant was receiving IOP treatment for several days per week during the relevant period, but this does not support that the claimant would have work-preclusive attendance/absenteeism on an ongoing basis. Moreover, it is reasonable to infer that this treatment schedule could be adjusted for a work schedule if the claimant were working.

(Tr. 1098-99). Although it is true that Najdl regularly attended group sessions at the VA, these sessions appear to be voluntary and outside of his usual treatment schedule of medication management with Dr. Tamayo-Reyes and his therapy sessions with Ms. Zoller. These group sessions were created as a peer support response to the COVID-19 pandemic. (*See* Tr. 628). As

20

indicated in the record, a peer support specialist "contacted Veteran by phone on May 14, 2020, to invite Veteran to participate in new Peer Support Telephone Group in response to the COVID-19 pandemic. The Tele-groups will begin at 0915 and end at 1030, on Tuesdays, Wednesdays, and Thursdays of each week. These Tele-groups will continue until it is safe to conduct face-to-face visits." (*Id.*). Thus, these groups appear to be a new offering by the VA to provide drop-in options for their veteran clients where the pandemic was restricting the ability of counselors to conduct in-person visits. I do not disagree that these Peer Support Telephone Groups appear to be helpful to Najdl, particularly during pandemic isolation. (*See* Tr. 964, describing to Dr. Tamayo-Reyes that his "[a]ctive participation in . . . peer support groups . . . help[s] him to cope and not get so depressed."). However, I do not find that Najdl has carried his burden to demonstrate that his attendance in these drop-in peer support sessions necessitates a finding of disability.

The ALJ evaluates the severity of a claimant's mental limitations to determine how those limitations affect their capacity to work. 20 C.F.R. § 404.1545(c) ("When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis"). Here, the ALJ determined that, even though Najdl attended group peer support sessions multiple times per week, those sessions did not rise to the level of becoming work preclusive. (*See* Tr. 1098-99). Further, although Najdl contends that the RFC does not sufficiently accommodate his needs, he has not presented evidence that the ALJ left unconsidered.  "[A] reviewing court can reverse the findings of an ALJ only if they are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Najdl contends the ALJ should have weighed the evidence differently,

but it is not for this Court to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Id.* Thus, I find that Najdl has not met his burden to demonstrate that the ALJ's RFC does not accommodate his impairments and decline to recommend remand on this basis.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Najdl's application for DIB be affirmed.

Dated: October 30, 2024

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus

on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).